UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAMPAIGN LEGAL CENTER,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL ELECTION COMMISSION,<br><br>Defendant. | Civil Action No. 22-1976 (JEB) |

### MEMORANDUM OPINION

It is a lot easier to follow the money when you have a paper trail. The Federal Election Campaign Act therefore requires political campaigns to provide appropriate disclosures when they make operational expenditures. In July 2020, Plaintiff Campaign Legal Center filed a complaint with Defendant Federal Election Commission alleging that former President Donald J. Trump's campaign deliberately skirted that requirement. After reviewing CLC's complaint, however, the six-member Commission deadlocked 3-3 on the question of whether there was reason to believe that a FECA violation had occurred. Without a majority willing to proceed with an investigation, the complaint was dismissed.

Plaintiff filed this suit seeking judicial review of that dismissal. Defendant, however, retorts that the dismissal is unreviewable. It notes that the three Commissioners who voted against finding reason to believe invoked, among other rationales, their prosecutorial discretion. The Commission contends that under Circuit and Supreme Court precedent, that invocation places the dismissal of CLC's complaint outside the reach of judicial review. The Court agrees and will therefore grant Defendant's Motion to Dismiss.

1

I.     **Background**

    A.  Factual and Legal Background

The Federal Election Campaign Act provides that when a political committee spends money on campaign operations, it must disclose where that money is going and for what. After all, "disclosure . . . 'as to where political campaign money comes from and how it is spent by the candidate' . . . aid[s] the voters in evaluating those who seek federal office." Buckley v. Valeo, 424 U.S. 1, 66–67 (1976). Section 30104 of FECA therefore requires each "political committee" to "file reports of receipts and disbursements" with the Commission that identify "each person to whom an [operating] expenditure . . . in excess of $200" was made as well as the "date, amount, and purpose" of the expenditure. See 52 U.S.C. § 30104(a)(1), (b)(5)–(6); see also 11 C.F.R. § 104.3(b) (regulations mirroring statute).

As with any rule, though, § 30104 has loopholes. Imagine, for example, that a political committee made large, lump-sum payments to a primary vendor, which then made a bunch of operational disbursements to subvendors. While the initial payment would be subject to § 30104, the secondary ones would not. As a result, if the campaign effectively controlled the primary vendor, it could largely avoid making § 30104 disclosures by reporting only the initial payment to that vendor and then directing the vendor to make secret disbursements to subvendors on the campaign's behalf. To close that loophole (or to at least narrow it), Commission precedent provides that "merely reporting the immediate recipient of a committee's payment will not satisfy the requirements of [§ 30104] when the facts indicate that the immediate recipient is merely a conduit for the intended recipient of the funds." ECF No. 13-1 (Controlling Comm'rs Statement of Reasons) at 5 (formatting altered).

In late July 2020, CLC, a campaign-finance watchdog, filed an administrative complaint with the FEC alleging that former President Trump's campaign committee (Donald J. Trump for President, Inc.) and one of his joint fundraising committees (Trump Make America Great Again Committee) had violated § 30104's disclosure requirements by improperly exploiting exactly that loophole. See ECF No. 1 (Compl.), ¶¶ 1–2, 29. According to CLC, the Committees channeled over three quarters of a billion dollars in payments to subvendors and staff through two LLCs — American Made Media Consultants (AMMC) and Parscale Strategy — without disclosing the ultimate payees or purposes of the payments to the Commission. Id., ¶¶ 29–30. The Committees did so "even though [AMMC and Parscale] both (1) did not have arm's-length relationships with the Committees and (2) were used by the Committees as conduits for disbursements to subvendors that were effectively working directly for the Committees." Id., ¶ 31. CLC included with its FEC complaint evidence of the degree to which AMMC and Parscale were entwined with the Trump Campaign.

In sum, CLC submitted to the FEC that by using two companies that were essentially extensions of the Trump Campaign, the Campaign made hundreds of millions of dollars in payments to unidentified payees for undisclosed purposes in violation of FECA.

B. FEC Procedural History

The Commission may initiate an investigation into an alleged violation if it "determines, by an affirmative vote of 4 of its members, that it has reason to believe that a person has committed . . . a violation of" FECA. See 52 U.S.C. § 30109(a)(2) (emphasis added). Before the Commission voted on that question here, its Office of General Counsel took a first pass at CLC's complaint and agreed that something untoward might have been afoot. See Compl., ¶ 54. Relying on Commission precedent and on the submitted record, OGC recommended that the

Commission find reason to believe that the Committees had violated § 30104(b) by failing to properly report the ultimate recipients and purposes of payments made to AMMC and Parscale Strategy. Id. But an OGC recommendation is just that, and when the recommendation made its way to the Commission, the tides turned.

On May 10, 2022, in what turned out to be a busy day for the Commission, the six Commissioners held four sequential votes. The Court will briefly describe each one here, and then it will return in its analysis to the question of which votes were legally relevant for judicial-review purposes. First, the Commission deadlocked 3-3 on whether to approve OGC's recommendation and find reason to believe that the Trump Committees had violated § 30104 in the various ways alleged by CLC. Id., ¶ 59. Commissioners Broussard, Walther, and Weintraub voted affirmatively — that is, they voted to find reason to believe — while Chairman Dickerson and Commissioners Cooksey and Trainor voted against. See ECF No. 15-2 (Certification) at 2. Without the four necessary votes, the complaint could not proceed. The Commission then held a second vote, this time on whether to dismiss the allegations as an exercise of prosecutorial discretion "pursuant to Heckler v. Chaney." Id. The Commission deadlocked once more, with the Commissioners who had found reason to believe voting against dismissal and the rest voting in favor. Id. In their third vote of the day (and their second reason-to-believe vote), the Commission deadlocked once more, this time on a subset of the allegations they had voted on earlier. Finally, the Commissioners decided 4-2 (their fourth vote) to close the file and so dismiss the case. Id. at 3. Commissioners Walther and Weintraub dissented from that dismissal.

A month later, the three Commissioners who had voted against finding reason to believe in the first and third votes issued a Statement of Reasons explaining their position on those questions and on the dismissal. See Compl., ¶ 63. Commissioners Dickerson, Cooksey, and

4

Trainor found that "the legal support for enforcement" was "remarkably thin," and that "the only arguable factual support comes from inferences based upon media reports citing anonymous sources." Controlling SOR at 1. "We will not pursue enforcement-by-rumor," they continued, and "we . . . instead voted to dismiss this matter as an exercise of prosecutorial discretion pursuant to Heckler v. Chaney." Id. The Statement elaborated on each of those points, including by canvassing the Commission's prior treatment of similar allegations, id. at 8 (noting that "it would be a marked departure from prior practice" for the Commission to "require[] further itemization of payments" here), and the strength of the factual record. Id. at 7 (finding that "there is no indication that either AMMC or Parscale Strategy was a 'mere conduit' for payment of funds to a third-party that was 'not involved in the provision of services by the payee'"); id. at 8 (rejecting OGC's reliance on "imprecise" news articles that rely on "anonymous sources").

Finally, the Commissioners concluded by returning to Heckler. They explained:

> We foresee significant litigation risk if we were to act on [this record] and, as importantly, we decline to permit the investigatory resources of the federal government to be mobilized on such a basis. This is particularly so here, where the size and scope of the proposed investigation could quickly consume an outsized share of the resources available to the Commission.

Id. at 12. Having found that the matter did not "warrant further use" of FEC resources, the three Commissioners "elected to dismiss this matter as an exercise of prosecutorial discretion under Heckler." Id. at 13.

Commissioners Broussard and Weintraub responded a week later with their own Statement of Reasons. See ECF No. 13-2 (Non-Controlling Comm'rs Statement of Reasons). They accused the "Republican commissioners [of] selectively cit[ing] the evidence . . . to draw false and conclusory distinctions between" this matter and precedent and "reject[ed] [the] attempt to discredit news reports as appropriate sources of information." Id. at 3–4.

On July 8, 2022, Plaintiff filed the suit here challenging the Commission's dismissal as contrary to law.  See 52 U.S.C. § 30109(a)(8)(A) ("Any party aggrieved by an order of the Commission dismissing a complaint . . . may file a petition with the United States District Court for the District of Columbia.").  A week later, apparently anticipating what would become the Commission's primary defense in its Motion to Dismiss the Complaint, Commissioner Weintraub issued a supplement to her joint statement with Commissioner Broussard.  See ECF No. 13-3 (Weintraub Statement of Reasons).  She argued, in sum, that while her colleagues who had blocked the investigation had "purport[ed] to invoke prosecutorial discretion," their statement was "nothing but a straight factual and legal analysis of the merits of this matter."  Id. at 1–2.  Commissioner Weintraub thus concluded that the analysis was "ripe to be reviewed by courts reviewing the Commission's dismissal of this complaint."  Id. at 2.  As Defendant has moved to dismiss on non-reviewability grounds, it is now up to this Court to decide that question.

**II.      Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) permits dismissal of a complaint for failure to state a claim upon which relief may be granted.  In evaluating such a motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that

is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. A court need not accept as true, then, "a legal conclusion couched as a factual allegation," Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

### III. Analysis

The parties initially disagree about which rationale for dismissal is the relevant one for purposes of judicial review. They also dispute whether the Commission's dismissal is reviewable at all. The Court will take each issue in turn.

#### A. Rationale for Dismissal

Recall that the three Commissioners who voted not to proceed with an investigation released a Statement of Reasons for their vote that included a substantive discussion of the allegations alongside an invocation of prosecutorial discretion. See Controlling SOR. Defendant contends that for purposes of judicial review, that entire Statement of Reasons comprises the relevant rationale for dismissal of the complaint. See ECF No. 16 (Reply) at 6–9. Plaintiff, on the other hand, argues that because the Commission later deadlocked 3-3 on the narrower question of whether to dismiss the complaint under Heckler (before subsequently voting 4-2 to dismiss), the Statement is controlling "only with respect to the Commission's separate, substantive determination to find no 'reason to believe' FECA had been violated," and not with respect to the reliance on prosecutorial discretion. See ECF No. 15 (Def. Opp.) at 15. This Court disagrees with CLC and concludes that the entire Statement of Reasons is relevant.

7

1. *Application of Governing Test*

The doctrinal framework for this issue was established by a trilogy of cases, the first of which was decided about 35 years ago. That case, <u>Democratic Congressional Campaign Committee v. FEC</u> (<u>DCCC</u>), 831 F.2d 1131 (D.C. Cir. 1987), began much like this one. After evaluating an FEC complaint from the Democratic Congressional Campaign Committee, the OGC recommended that the Commission find reason to believe a violation had occurred, but the Commission deadlocked 3-3 on the question. <u>Id.</u> at 1132–33. "Because DCCC's complaint thus failed to attract the requisite four affirmative votes, the FEC dismissed it." <u>Id.</u> at 1133 (citation omitted). Unlike in this case, however, "[n]either the Commission nor any of the individual Commissioners gave any reasons in explanation of the vote." <u>Id.</u>

The primary question on appeal was whether an FEC dismissal that resulted from a deadlock was "amenable to judicial review." <u>Id.</u> at 1132. In an opinion by then-Judge Ruth Bader Ginsburg, the panel concluded that in the circumstances of that case, the answer was yes. <u>Id.</u> Recognizing the practical obstacles to reviewing a decision with no written explanation, however, the court went one step further: where the Commission ultimately departs from the General Counsel's recommendation to proceed with an investigation, the court held, "it is incumbent upon the Commissioners to state their reasons why." <u>Id.</u> The implication of that holding was that when the Commission deadlocks on a reason-to-believe vote, the reasoning of the Commissioners who voted against the OGC's recommendation to proceed is the reasoning subject to judicial review.

A year later, the Circuit reaffirmed that rule and elaborated on it. In <u>Common Cause v. FEC</u>, 842 F.2d 436 (D.C. Cir. 1988), the court explained that in the event of a deadlock resulting in dismissal, "the declining-to-go-ahead Commissioners" must issue a statement of reasons. <u>Id.</u>

at 449.  Such a statement "is necessary to allow meaningful judicial review of the Commission's decision not to proceed." Id. (emphasis added).  The Common Cause court continued, "[S]ome explanation of the views of the decliners will enhance the predictability of Commission decisions for future litigants." Id. (emphasis added).  The court acknowledged that such a statement would not be binding precedent because FECA "clearly requires that for any official Commission decision there must be at least a 4-2 majority vote." Id. at 449 n.32.  But it would at least permit meaningful judicial review, and it would help inform future parties before the FEC "of the evidence practically necessary to convince a majority of the Commission to proceed with an investigation." Id. at 449.

Thirty years later, the court decided Citizens for Responsibility & Ethics v. FEC (Commission on Hope), 892 F.3d 434 (D.C. Cir. 2018), a deadlock case where the controlling Commissioners voted against finding reason to believe and for dismissal under Heckler.  The Circuit there confirmed that DCCC and Common Cause's rule applies with equal force when the "three naysayers . . . placed their judgment . . . on the ground of prosecutorial discretion." Id. at 439.  In such cases, it is still the judgment of the naysayers that controls for judicial-review purposes.

The lesson from that trio of cases is clear: where the FEC dismisses a complaint after it has deadlocked 3-3 on the reason-to-believe vote, the declining Commissioners — the "so-called 'controlling Commissioners'" — must issue a statement of reasons, and that statement, whatever its contents, must be treated as the reasoning for the dismissal by a reviewing court. Id. at 437.

With that framework in place, the answer to the first question in this case is straightforward.  DCCC and its progeny instruct that in order to review the Commission's deadlock dismissal of CLC's complaint, this Court must look to the reasoning of the three

Commissioners who voted against finding reason to believe. Here, those are Chairman Dickerson and Commissioners Cooksey and Trainor. Following DCCC's instructions, the three of them issued a joint Statement of Reasons. Because that Statement, like the one in Commission on Hope, invokes prosecutorial discretion, this Court must treat prosecutorial discretion as part of the rationale that supported dismissal of Plaintiff's FEC complaint. See Controlling SOR at 12–13.

    2. *Counterarguments*

Plaintiff makes a creative — though ultimately too formalistic — attempt to distinguish this case from Commission on Hope and related precedent. It reminds the Court that after the first reason-to-believe vote and prior to the dismissal, the Commission voted on the narrower question of whether to dismiss the complaint specifically "pursuant to Heckler v. Chaney." Opp. at 15. Unsurprisingly, the vote failed 3-3, with the controlling Commissioners voting in favor and the others voting against. Id. According to CLC, that vote had the effect of nullifying the controlling Commissioners' reliance on Heckler because the Commission "expressly declined to dismiss the matter for reasons of prosecutorial discretion," id. at 16, and the Commission may only act "by a majority vote." Id. (quoting 52 U.S.C. § 30106(c)). As such, CLC urges this Court to consider only the remainder of the controlling Statement.

The Court is unpersuaded. DCCC and its progeny are clear that in the event of a deadlock, only one vote matters for purposes of assessing the "lawfulness of the dismissal": the vote on whether to proceed with an investigation into the complaint. Commission on Hope, 892 F.3d at 443 (Pillard, J., dissenting). And it is the reasoning of the Commissioners who voted against enforcement — and theirs alone — that is relevant before a reviewing court. Here, those Commissioners invoked prosecutorial discretion twice: first by voting "yes" on the Heckler vote

10

and second by expressly relying on it in their later-issued Statement of Reasons, which supported the reason-to-believe declination. See Controlling SOR at 12–13. Precedent requires this Court to credit that invocation in reviewing the dismissal.

Indeed, this Court struggles to understand how the Heckler vote helps Plaintiff or distinguishes this scenario from cases like Commission on Hope. Contrary to CLC's suggestion, see Opp. at 18, that Heckler vote provided no new information to the Court. It simply previewed the content of the controlling Commissioners' Statement of Reasons. That those Commissioners expressed their rationale for dismissal in two places does not change the relevance of their rationale to this Court's review; in fact, it only strengthens our understanding of their motivations.

Nor does the explicit disagreement of three Commissioners with that reasoning make a difference. After all, Commission on Hope assumed that when the controlling Commissioners in a 3-3 reason-to-believe vote invoke prosecutorial discretion to dismiss an FEC complaint, the remaining three Commissioners disagreed with that invocation. See 892 F.3d at 437. Indeed, the disagreement of three Commissioners with the stated rationale for dismissal is a premise of the rule established by DCCC and Common Cause. Id. (noting that DCCC answered question of how "a court [can] attribute to 'the Commission' any particular rationale when the Commissioners were evenly split"). At most, then, the Heckler vote pulled back the curtain and made explicit what was implicit in Commission on Hope. To be sure, had any one of the controlling Commissioners instead voted "no" in the Heckler vote, the validity of the controlling Statement's later reliance on Heckler might have been called into question. In that case, CLC's argument would have considerable weight. That is not what happened here.

CLC's remaining arguments are nothing more than objections to the reasoning of DCCC, Common Cause, and Commission on Hope, which this Court is bound to follow. Plaintiff's principal concern seems to run as follows: when a court treats three Commissioners' reasoning for dismissal as controlling over the explicit dissent of three others, it "flout[s] the statutory scheme and the FEC's 'inherently bipartisan' structure." Opp. at 19. It does so by empowering a "minority bloc[] of Commissioners" to act, id. at 19, even though FECA permits the Commission to "exercise . . . its duties and powers" only by a four-vote majority. Id. at 16 (quoting 52 U.S.C. § 30106(c)). Here, for example, by crediting the controlling Commissioners' reliance on prosecutorial discretion over the explicit vote of the remaining three Commissioners, this Court is treating the FEC as if it dismissed CLC's complaint for reasoning that failed to garner a majority. Yet, CLC contends, "[W]hether to exercise prosecutorial discretion" is one of the Commission's powers that it cannot wield without a majority. Id.

The problem for CLC, however, is that the reasoning it resists is precisely that which DCCC endorsed. To understand why, consider how a deadlock dismissal proceeds in practice. Because a case cannot be dismissed with only three votes, in any dismissal following a 3-3 reason-to-believe vote, at least one of the three non-controlling Commissioners must have voted for dismissal despite preferring not to dismiss the case for substantive reasons. See Opp. at 18. Presumably, that Commissioner did so only because she found dismissal to be the better of two unsatisfactory options (the other being to leave the matter open and unresolved) and not because she changed her mind to agree with the controlling three on the merits of a dismissal. See Opp. at 19. Still, DCCC instructs that for judicial-review purposes, courts should set aside the rationale of that fourth Commissioner and treat the reasoning of the three controlling Commissioners as dispositive. Common Cause, 842 F.2d at 437–38. What CLC deems

impermissible and contrary to FECA's structure — that is, treating the reasoning of a non-majority as if it were the reasoning of a majority — is thus exactly what DCCC demands. The Circuit was not unaware that its rule would somewhat elide FECA's majority requirement. Indeed, Common Cause acknowledged that fact in cautioning that the Statement of Reasons in a deadlock dismissal has no precedential effect because it lacks a majority to back it. Id. at 449 n.32. Commission on Hope later dubbed DCCC's rule "a rather apparent fiction." 892 F.3d at 437–38. Grounded in fiction as it may be, however, this Court is bound by it.

      The Court must also reject CLC's theory that the Heckler vote was essential to the dismissal outcome because without it, the matter "might well remain open and unresolved." Opp. at 19. The Court understands CLC to be arguing that Commissioner Broussard, who voted both in favor of finding reason to believe and in favor of dismissal, see Certification at 2–3, would not have voted to dismiss without the assurance from the Heckler vote that the dismissal would be subject to judicial review. And, CLC insists, an agency action must be judged on the record on which it was based. See Opp. at 19. For the reasons just discussed, however, Broussard's rationale for voting to dismiss the FEC complaint is ultimately not part of the relevant "record" for review. Once the Commission deadlocked 3-3 on the reason-to-believe vote, the fate of the dismissal as it pertains to judicial review was sealed: any dismissal would be reviewed (or not) on the basis of the rationale provided by the three controlling Commissioners. In any event, there is no evidence for CLC's theory that Broussard voted to dismiss solely on the condition that the dismissal would be reviewable. This argument thus makes no headway.

      The Court therefore concludes that the Heckler vote did not nullify the controlling Commissioners' reliance on prosecutorial discretion. To the extent that such result is in tension

with FECA's statutory scheme, the Circuit has accepted that tension as a necessary result of its holding in DCCC. It is not this Court's role to question that decision now.

B. Reviewability

Having determined that the controlling Commissioners' entire Statement provides the rationale for the dismissal of CLC's complaint, this Court may now proceed to the second question raised by the Motion to Dismiss: is that dismissal reviewable in light of those Commissioners' invocation of prosecutorial discretion? Once again, Circuit precedent provides an unequivocal answer: no.

Such result is foreordained by Commission on Hope and Citizens for Responsibility and Ethics v. FEC (New Models), 993 F.3d 880 (D.C. Cir. 2021). Recall that in the former case, the FEC had dismissed a complaint after deadlocking on a reason-to-believe vote. "The three naysayers . . . placed their judgment squarely on the ground of prosecutorial discretion." Commission on Hope, 892 F.3d at 439. The D.C. Circuit held that under Heckler, that dismissal was unreviewable. Id. The dissent insisted otherwise because the controlling Commissioners must have interpreted FECA and reached the merits before exercising their prosecutorial discretion. Id. at 444–45 (Pillard, J., dissenting). The majority retorted that "[t]he law of this circuit 'rejects the notion of carving reviewable legal rulings out from the middle of non-reviewable actions.'" Id. at 442 (majority opinion) (quoting Crowley Caribbean Transport, Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994)).

A few years later, the Circuit reiterated and then expanded the scope of that rule. In New Models, it was asked to review another dismissal by the Commission. This time, the Commissioners "who voted against proceeding issued a thirty-two page statement of reasons" that was mostly dedicated "to legal analysis of the alleged violations," including whether the

14

target of the complaint (New Models) qualified as a "political committee" under FECA. See 993 F.3d at 883. Before signing off, though, the Commissioners added a final paragraph stating that "they were also declining to proceed with enforcement 'in exercise of their prosecutorial discretion.'" Id. (alteration omitted). They cited Heckler and explained that "given the age of the activity and the fact that the organization appears no longer active, proceeding further would not be an appropriate use of Commission resources." Id. (alteration omitted).

The question in New Models was whether that brief and fleeting mention of Heckler — a "rhetorical wink at prosecutorial discretion" — was enough to insulate the dismissal from judicial review. Id. at 896 (Millett, J., dissenting). The answer, the court concluded, was "inexorably" yes. Id. at 884 (majority opinion). The panel found New Models to be "materially [in]distinguishable" from Commission on Hope. Id. That case, the court explained, held that "a Commission nonenforcement decision is reviewable only if the decision rests solely on legal interpretation." Id. It continued, "[A] Commission decision that rests even in part on prosecutorial discretion cannot be subject to judicial review." Id. (emphasis added).

This case falls squarely within the scope of New Models's quite capacious rule. The Statement of Reasons issued by the controlling Commissioners here is, in all relevant ways, indistinguishable from the one there. As in that case, the vast majority of the controlling Commissioners' Statement analyzed the factual and legal support for CLC's complaint. See Controlling SOR at 2–12. But, also like the statement in New Models, the Statement here concluded with a discussion of Heckler and "explicitly relie[d] on prosecutorial discretion." Id. at 12; New Models, 993 F.3d at 885. It did so by "express[ing] discretionary considerations at the heart of [Heckler's] holding, such as concerns about resource allocation" and "potential evidentiary . . . hurdles." New Models, 993 F.3d at 885. The Commissioners in this case

15

foresaw "significant litigation risk" were they to act on the evidence in the report, and they "decline[d] to permit the investigatory resources of the federal government to be mobilized on such a basis." Controlling SOR at 12. In reaching that conclusion, the Commissioners took note of the "size and scope of the proposed investigation," which could consume a disproportionate amount of FEC resources. Id. The final sentence of the Statement reads: "Accordingly, we . . . elected to dismiss this matter as an exercise of prosecutorial discretion under Heckler." Id. at 13. The FEC dismissal here thus meets the same fate as the one in New Models: it is "necessarily unreviewable under the APA and the reasoning of [Heckler]." 993 F.3d at 885.

CLC responds that this case is distinguishable from New Models and Commission on Hope because prosecutorial discretion here was not an independent rationale for dismissal. Rather, the Commissioners "invoked discretion entirely because of" their legal analysis. See Opp. at 21. In New Models, by contrast, "prosecutorial discretion [was] exercised in addition to the legal grounds." 993 F.3d at 887. This position is far from frivolous; indeed, the Court recognizes that the controlling Commissioners' invocation of prosecutorial discretion is closely intertwined with — if not dependent on — its legal analysis. For example, their mention of "thin legal . . . support for enforcement" surely rests at least in part on disputable legal conclusions. See Controlling SOR at 12. The Court ultimately is constrained to agree with Defendant, however, for three independent reasons.

First, at least some, even if not all, of the controlling Commissioners' invocation of Heckler appears to have been independent of pure legal inquiry. More specifically, the Commissioners expressed concern that the "size and scope of the proposed investigation" could quickly consume the resources available to the Commission. Id. at 12. That is a quintessential consideration in the exercise of prosecutorial discretion, and it stands apart from the legal

questions in this case.  Indeed, CLC makes no effort to dispute that the size and scope of the investigation would be significant, nor does it explain how such practical concerns stem from legal conclusions.  The controlling Commissioners also invoked the uncertain regulatory environment, which is due in part to a pending rulemaking petition on "Subvendor Reporting" that would address situations like this one.  Id.  CLC does not mention that pending rule, nor does it explain how the Statement's discussion of it relies on legal analysis.

Second, and alternatively, the Court is not persuaded that the Statement in New Models clearly invoked prosecutorial discretion as an independent ground for dismissal.  The dissent, after all, pointed out that because the Commissioners there invoked Heckler in a "dependent clause with seven magic words," it was "not at all clear . . . that the Commissioners would dismiss this case on prosecutorial-discretion grounds alone."  993 F.3d at 896, 902 (Millett, J., dissenting).  The Statement here, which devotes much more than seven words to a discussion of prosecutorial discretion, may not be a slam dunk.  But it is at least clearer in this case than it was in New Models that the Commissioners invoked their discretion as an independent reason for dismissal.

Finally, the Court is hesitant to engage in the exercise of distinguishing uses of prosecutorial discretion that depend on legal analysis from those that do not.  After all, certain quintessential considerations in the exercise of that discretion are inherently inseparable from legal conclusions.  Take, for example, an agency's view of the "likelihood of success" in enforcement.  Id. at 885 (majority opinion) (quoting Ass'n of Irritated Residents v. EPA, 494 F.3d 1027, 1035 (D.C. Cir. 2007)).  It is hard to imagine the FEC analyzing the viability of enforcement without relying, even if implicitly, on legal conclusions that a Plaintiff could dispute.  Yet, the court in New Models noted: "The Commission's decision here explicitly relies

on enforcement discretion — discretion that turns on practical concerns about . . . the viability of an enforcement claim. Such discretion does not turn on legal grounds . . . ." Id. at 895 (emphasis added). This Court struggles to see why the Commissioners' statement here — that "we do not believe the Commission would ultimately be successful in pursuing [enforcement]" — is any different from the one in New Models. Taken to its limit, CLC's attempt to limit the scope of New Models might risk swallowing the rule, not to mention the panel's instruction that "reviewable legal rulings" may not be carved out "from the middle of non-reviewable actions." Id. at 886 (quoting Commission on Hope, 892 F.3d at 442). This Court must therefore assume that the Circuit contemplated that some grounds for exercising prosecutorial discretion would be sufficient to block judicial review even if they appeared to be entwined with legal conclusions.

Before concluding, the Court notes that a petition for rehearing en banc in New Models has now been pending before the Circuit for over a year. See Citizens for Responsibility & Ethics v. Am. Action Network, 590 F. Supp. 3d 164, 174–75 (D.D.C. 2022). The Court has no idea at what point a decision may issue, and it believes that the parties here deserve a ruling. Given that, at least for now, New Models remains good law, and given that there is no principled basis on which to distinguish this case from that one, the Court is bound to hold that the Commission's dismissal here is unreviewable.

**IV.   Conclusion**

For the foregoing reasons, the Court will grant the Motion to Dismiss. A separate Order so stating shall issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  December 8, 2022